Thank you, Your Honor. Robert Darby, Fulbright & Jaworski for Kishner and Appellant Richard Boyd. May it please the Court, I'd like to reserve five minutes of my time. Your clock in front of you and whatever's left over you have. Very good. Because of the extensive briefing, I would like to confine my argument today to two and perhaps, if there's time, three items. The Batson claim in terms of the exclusion of Juror Ernestine Perdue. The pervasive and prejudicial, ineffective assistance of counsel of Mr. McMillan at the penalty phase, especially with respect to the evidence of abuse in the family and his use, or I would say abuse, of his psychological experts. And if there is time, I would like to address the Court's denial of the following the evidentiary hearing on the undisclosed promise of leniency. As to the jury selection issue, if this Court had not granted an expansion of the Certificate of Appealability with respect to the exclusion of Ms. Batson, Ms. Perdue, there would never have been a particularized analysis or evaluation of the reasons given by Prosecutor Webster for excusing her. The trial court below did what this Court has instructed should not be done. It merely accepted Mr. Webster's explanations at face value. It did not conduct a meaningful evaluation of those reasons, as this Court requires. What should he have done that he didn't do? He called for an explanation. Webster gives his reasons. What's the judge supposed to do? Well, following that, he should give an evaluation of his decision that the reasons are not protection. In other words, as this Court has said, I believe him. Well, but that's not, I would submit, that's not a reasoned explanation. That's a conclusion. And so all that was, was what this Court has said should not be done. That was accepting at face value. I believe him. But we don't know what the judge was thinking, why he believed him. And, in fact, it's hard to understand how he believed him when you look at the reasons given and the fact that those reasons, I think, in some cases don't even make it over the second-tier hurdle of Batson. And they certainly have problems with the third-stage analysis under Batson and this Court's McLean v. Prunty decision. I think the worst reason given by Mr. Webster and it should be pointed out that the death penalty qualifications, the willingness to agree with the death penalty or vote for the death penalty was really not involved in Mrs. Perdue's exclusion. Mr. Webster told the Court that he would have kept two other black jurors if they had been down the middle on the death penalty in terms of their willingness to impose it if the law required. As to Mrs. Perdue, he admitted that he doesn't have any problem with the content of the discussion, her discussion, on the willingness to impose a death penalty. He said that she was a little hesitant, but that's not my main problem with Mrs. Perdue. His main problem was a series of excuses which I submit do not pass the Batson analysis. And the first one is the worst one, which is that she used to live in Paris, California. And he said, I've had trouble with jurors from Paris, and I have – I am distrustful of certain areas of that community. Now, I believe that under Bishop, under this Court's decision in Bishop, that was an excuse using only the area of the residence without any connection to the facts of the case. Now, even the Respondent concedes that the race-neutral explanation has to be related to the facts of the case to be tried. This one was not. And, in fact, it is – it has an inherent discrimination, as did the Bishop reference the Compton, when he makes the reference that he has a problem with that – a certain area of Paris. I mean,  But I've never heard of Paris. Is it in the record as to what kind of community it is? It is not in the record. You have to draw an inference. If he had said there's – you know, I have problems. It's something we'd have to take additional notice of. Or – I'm not saying we should or would, but I would say if we're going to consider the – because there's an implication, I believe, that it's a largely minority community. Well, I think that's – I think that's fair. It wasn't clear to me exactly what it was. I've never heard of it. And I think you could be – you could take additional notice that it is a minority community, Hispanic and African-American. But I think the judge – you could draw an inference from, you know, certain areas of Paris. He wasn't referring to the whole town. And I think the inference is that he wasn't referring to the business district or the houses on the hill, and that in that sense, just on a flat, second-stage Bassett analysis, it was inherently discriminatory. But even if you can't go that far, I think you have to conclude that he never tied his concern about Paris to any facts of the case. He didn't relate it to any reason why – not only did Mrs. Perdue not live partly in Paris – Let's say it had been – not Paris. Let's say it had been Westwood. UCLA is in Westwood, and so everybody knows it, and so you'd expect to have lots of students, lots of academics there. They tend to be maybe more liberal. At Parsi, he might say, you know, I'd really rather not have anybody from Westwood because they tend to be air-headed academics. And maybe that's – he doesn't say because, but that's the inference you draw. You know, you really don't want to have a juror from a community that has certain demographics where – Well, here you had a black – I'm not quite sure what the implications – so, you know, Westwood would say something to me, for example. I'm not quite sure what the implications would get from Paris. Well, the context is you have a black juror. Now, you know, I don't know whether you'd get a similar comment on Westwood if you had a black juror, but you had a black juror, and he's saying, I have problems with certain areas of that town. I mean, I wouldn't be surprised if you were a prosecutor in West Los Angeles. You would sort of make a mental note that people sort of lived around Westwood. You would – you'd be more likely to strike just because, you know, academics are the way they are. Well, no, I mean, I would imagine that they are the kind of people that prosecutors would not prefer to have on the jury. And I – so sometimes demographics can matter. I'm – but here he was not drawn out. He didn't say what's the trouble he had with the community. And so we're left to infer what it is about the community. If I might, I don't want to get hung up on the second-stage Bassett analysis, because I understand that that's a pretty low threshold. It's just got to be – Well, the reason I'm actually – I find it troubling, but I don't quite know what to do with it or where it takes us. Let's say we look at it and we say, yeah, you know, that was a bad reason. That was not a legitimate reason. It's not necessarily a bad – an objectionable reason. I mean, let's say the – let's say he says, gee, I think that certain communities have been bad luck for me in the past. You know, jurors from particular communities just always – I've had bad luck with them, you know, something like that. It would not be a rational reason, but it wouldn't necessarily be – it wouldn't necessarily be a racially discriminatory reason, which is what Bassett speaks about. Well, but the cases – the cases, especially Bishop, have said that on a third-stage analysis – and I appreciate what you're saying as to the second stage, that if you assume that you don't need an explanation relating the challenge to the facts of the case, but when you say I have problems in certain areas of Paris – and I should point out Mrs. Perdue didn't even live in Paris at the time of the challenge. She had moved from there seven years ago. So it becomes a little more attenuated, and he never explained, you know, why it was that she, having lived seven years ago in Paris, is now not fit to decide the issues in this particular case. So on that level, I think – Maybe it wasn't a terribly rational reason, but I'm not seeing how it gets you to where you need to go. Well, only if – We really have to draw the inference of when he said, I don't like – I've had trouble with people from certain parts of Paris, but he's really – Paris, right? Paris, yes. P-E-R-I-S. P-E-R-I-S. What he's really saying is that the minority poor, maybe black areas of the town are the ones where I never take jurors, and so that's a proxy for – it's not actually a proxy. It's actually a statement of – That would be more explicit. But in this case, he never explained its relation to the facts of the case. And take it in context with his other – And counsel could have pressed him on that, could he not have? The court could have pressed him. That didn't happen, but I think Batson and Bishop put the obligation on the party seeking to exclude, at least at the second stage, where he has to articulate his reason. It has to be related to the facts of the case. And this was not related to the facts of the case. So what if he says, you know, this morning I consulted my astrologer, and he said, don't seat any jurors whose last name starts with another B. I mean, totally irrational, but nonracially. Well, it's – What does that put – The Supreme Court's Perquet decision suggests that that's the kind of implausible or fantastic reason that would be weeded out at the third stage with Batson. And it would be weeded out because it's an excuse, or it's weeded out – Because it's fantastic. It's fantastic in a way, in a sense, like his analogy to the victim of the trial that he had. You know, he said, another problem I have with Mrs. Perdue is that she was – she reminds me of this victim in a case that I tried before, and I don't – and, of course, this person was already dead by the time he tried the case. And so he's telling the court, this victim, you know, she would not have been able to vote for the death penalty. And I think Mrs. Perdue is like that victim. Well, that's almost like consulting the astrologer. It's almost like having a seance with the former victim. And Perquet says – It's the nature of a peremptory challenge. You can kick anybody off for any reason so long as it's not a bad reason. Isn't that the nature of peremptory challenges? Well, as long as it's related to the facts of the case. I went to a seminar when I was a prosecutor. They said, you know, strike everybody who wears a brown suit or don't take people with bow ties. I mean, it doesn't have to have any relation to the facts. Perquet says it can't be implausible or fantastic. I hear what you're saying. There is a line of cases which says you've got to give reign to the instincts of the lawyer. What about the other reasons he gave? Well, the other reasons he gave were, I think, equally implausible, not supported by the records. She does church work and he sees her as the world's grandmother. Well, let's talk about church work. She's a Seventh-day Adventist and she does church work. You use a comparative analysis and you look at Alice Dale, a white juror who was impaneled. Alice Dale was a member of the Seventh-day Adventist Church and did community service work. Just like Mrs. Perdue. So on a comparative analysis, that's circumstantial evidence of bias. How about she's large, heavy, set, older, and middle-aged? Well, once again, I mean, that is not related to the facts of the case. No, but that's like wearing the bow tie, isn't it? Well, I think that when you're dealing with the Bassan challenge, if you look at Bassan and it says the reason has to be related to the facts of the case, wearing a bow tie, if it's not related, it's just like there's a case before St. McLean, in this case. The juror had her elbow on the table. And she was excluded because the counsel didn't like the body language. And of course, that doesn't work because there's no way we can tie that body language to her unsuitability. There is a more objective standard required than the seminar that we took when you have a prima facie case of race discrimination. In this case, you had seven of the eight African-American jurors had already been excluded. Mr. Darby, I don't want to take you away from answering the question that my brother is asking you, but I was surprised that you started with Bassan. Did you start with your strongest point? I started with one of the two, but I wanted to start with the strongest one in the guilt phase. Go ahead and answer this question. I think I have. Let's see. And again, there was no reason to exclude her for the reasons he excluded the other jurors in terms of her actual content on the death penalty. So you look at it as a pretext. And the decision has to be he's not going to admit that he's doing it. What relief are you asking vis-à-vis your Bassan claim? The relief, I think, would have to be a new trial. No evidence. You're not asking for the evidence. You think the record is complete. Well, the Court, we didn't ask for an evidentiary hearing on Bassan because I don't know that you could take anything outside the record on this. So we did not ask for an evidentiary hearing. The Court didn't grant one, but the Court didn't make any findings either as to Ms. Perdue, and that's why we asked this Court. Assuming we were to agree with you that one of the reasons is not legitimate, might even have, you know, if we sort of massage the Paris statement and sort of get some racial animus out of it, and then we look at it and we see there are other reasons, you know, she involved in the church or whatever. So we have a mixed motive case. I mean, let's say we get there. What laws are on that? Well, that's, I mean, I guess that's your job under McLean because McLean says that the existence of one or more reasons that do not hold up under scrutiny militates against the sufficiency of the reasons given. And the fact that you're asking for pretext and you have to find pretext, it's hard to find. And this circuit in McLean has said if you find that there are reasons which are questionable under Batson, then that taints the other reasons you have to, because if any of the reasons are discriminatory, the challenge is unconstitutional. And if I might, I'd like to move on to the ineffective assistance of counsel in the penalty phase, unless there are other questions on that issue. I'm going to focus primarily on the failure of McMillan to, not to find, but really to develop the evidence of severe physical abuse of Mr. Boyd by his mother and his stepfather and the sexual abuse that was rampant in the family. The reason this is important is because of the Supreme Court's decision in Wiggins which requires in the evaluation of an ineffective assistance of counsel defense on penalty phase, it requires the Court to reweigh the evidence that was presented in mitigation against the evidence that was available and could have been presented. Or differently said, in this Court's opinion in Stankiewicz, the difference is the magnitude of the difference between the evidence presented and the evidence that could have been presented weighed against the aggravating evidence. Assume for the moment that he did what you want him to do and that he did establish that this young man had been abused. How would you have used it in this case on these facts? Well, it would have, you know, we submit that it would have dramatically affected the testimony at the penalty phase in several respects. It would first have completely changed the penalty phase because what the jury saw in the penalty phase was the first two witnesses in mitigation were the abusers, were mom and stepdad who were saying to the Court that, you know, they only, they would occasionally discipline Richard. The father said he hit him four times the whole time they lived together. The mom said, I never taught any violence in that house. There was never any problem. It was uneventful. This is what the Court heard. And McMillan knew that wasn't true. I asked him in his deposition, which is, I can find it quickly. If not, I won't take too much time. Do you think the jury would have known the facts of the case? Well, I think if McMillan. No, I mean what happened, how the crime was perpetrated. Well, certainly. But, but. So what would that information have done to the jury? Don't you have to convince us that that would have caused the jury not to give him the death penalty? No, I only have to convince you that there's a reasonable probability, a reasonable likelihood that one juror might have been inspired to sympathy if they'd heard that evidence. And if they hadn't heard the evidence that was given by the mother and father and by the two psychologists who never had the information of abuse. And that's what Stankiewicz says. And if you look. I think Stankiewicz. I think the point you made in your brief was that it would have changed summation quite a bit. No, it would have also changed the entire penalty case. Well, that's right. But having this other evidence would have changed the summation. That too. Which then might have pulled off one of the jurors. That too. The way his own mother portrayed him to the jury. That's true. This Court recently in Stankiewicz and the Supreme Court in Wiggins has said that this kind of evidence, this specific kind of abuse evidence is critical, especially when the aggravating evidence, which you're alluding to, is severe. And, I mean, if you look at the Stankiewicz case, which was just decided, you know, a few weeks ago by this Court, although, you know, you don't want to make degrees of terrible in terms of the aggravating evidence, but the Stankiewicz mitigating aggravating evidence was awful. Stabbings, bitings, shootings of other people. Now, the evidence, you know, in Mr. Boyd's case was aggravating. It was serious. But what the courts have said, the Ninth Circuit and the Supreme Court have said, is that's the very reason why you need to have this evidence of pervasive abuse. If you look at the Woods Declaration and the Ballas Declaration, if the jury had heard those two witnesses, which Judge Keller never got to hear because we never even got to an evidentiary hearing on this point, they would have, even Judge Keller admitted, and I think this is very interesting, even he admitted that this evidence might have been denying the evidentiary hearing. That's exactly the standard that the Douglas case, the 2003 Douglas case, establishes. If the evidence would have inspired sympathy from, or might have inspired sympathy from one juror, then it was prejudicial misconduct not to present it. So then Judge Keller, when he's denying the motion, says that the evidence that was presented while depressing wouldn't have inspired great sympathy. But that's not the standard. The standard is only if they had heard this. When you reweigh it, would one juror perhaps have been influenced? If I understand your case correctly, it wasn't simply the failure to present the evidence. There's also the, he should have omitted some of the evidence he didn't present. Essentially, he put the parents on the stand to say he's a bad seed, you know, we don't think that lawyers should have done it. He should have demonized the parents and painted the client as a victim and said, you know, the bad guys here are the parents who abused him and the sisters. Well, that was the reality. And the thing is that he knew that was the reality. We don't deal in realities here. Well, he was dealing with the reality. He had an obligation. His job is not to create reality. His job is to create doubt in the minds of the jury. Right. It doesn't really matter what the reality is. The question is, was there evidence there from which he could, that he could have put on the stand that might have painted his client in a favorable light or a sympathetic light, even if that didn't particularly relate to reality. And there was. And I asked him, you know, whether he knew that. I mean, I asked him in his deposition. I'll read this. I don't want to take a lot of time with this. So there's no mystery about the question I asked you, Mr. Dudley. The reason I asked you that was because quite often, and in the case you refer to, the kind of aggravation could reasonably be related to the abuse that the child had suffered. In this case, wouldn't it be quite a leap to say that the kind of aggravation would have some relationship to the abuse? I don't think so. It was a violent crime. And I think part of what the job is, of the lawyer, is to try. But the aggravation here was to try to keep from getting caught. Well, it's not clear, actually. But the thrust of the evidence of abuse is to show that the person has severe problems, emotional problems. In this case, Mr. Wood said, perhaps even brain damage as a result of the abuse, being hit in the face, in the head with a vase. And there was no tactical reason, no tactical reason for Mr. MacMillan not to use this evidence. Because when I asked him to refer to the testimony of Mrs. Kendrick, the transcript of her discussion with the investigator, and I said, you know, just confirm that the transcript contains direct evidence by Helen Kendrick of physical abuse, whippings of all the family members by both the mother and the stepfather. And he says, that was the basic impression that I got. So I said, why didn't you use it? And he said, well, it just didn't seem significant. And I said, it just didn't seem significant to you? And he said, well, I wouldn't put it that way. It just didn't seem that developed. And his job at that point was to develop it. And he failed to do that. And if he had done that, he would have, and he failed to give that information to the psychologist, who ended up testifying only to, as Judge Keller indicated, his personality defects. I submit that if they had heard the testimony of Dr. Woods and Mrs. Ballas, they would have had a different, more sympathetic view of Mr. Boyd than they had from Dr. Offenstein, who, again, compared Mr. Boyd to Charles Manson. Asked rhetorically in the penalty phase, what could he have learned from Charles Manson when they were cellmates together? It couldn't have been good. And this goes into the preparation of the witnesses. McMillan, the notes in the record, McMillan knew from interviewing his expert that Offenstein was going to say that. Offenstein was going to say that there was a connection with Charles Manson. If he had prepared Offenstein at all, and he didn't, and there's also a separate obligation to prepare mental health experts, that never would have come out. This is the only case that I'm aware of where the defense counsel has compared and the defense expert has compared the witness he defended in two separate contexts to Charles Manson. Is this like saying insurance in a civil case, if you just mention the words Charles Manson? Not if you mention the words, but if you say... He's trying to make a point. I mean, it was a rhetorical point he was trying to establish. If you say my client is just like Charles Manson, a child of your institutions... But his point was that he went to, he was a product of his environment. He went to, he had a hard life, was sent to prison, and prison did a number on him. I mean, that was the point of the comment, wasn't it? Well, who knows what the point is. He wasn't sure. He said his point was he wanted to allude to somebody that was worse than his client. And I'm not sure that was an effective way to do that. But if you are sitting next to your client, and I'm seeing the jury looking at Richard Boyd, and they're not seeing Richard Boyd because the argument, they're seeing Charles Manson sitting there. And Charles Manson didn't get executed because there was no death penalty, and it was ineffective decisions of counsel to put Charles Manson and Richard Boyd seated at the trial. I would now like to reserve the rest of my remarks for rebuttal. Thank you. We'll hear from the State. May it please the Court. William Wood, Deputy Attorney General. I will attempt to address my remarks to the issues raised by counsel, and, of course, I'd be happy to respond to any questions on other issues. I'll start with the peremptory challenge issue      It's an issue that we have to address. In my reading of Batson, I think it has to be taken in light of Perkett, a case that has not really been discussed by counsel. But I think it seems to me that in Perkett, the U.S. Supreme Court made it very clear that it is a misreading of Batson to say that in Step 2, the racially neutral reason has to be directly tied to certain facts of the case. I think it's also an error to say that the prosecutor didn't do that in any case because in each time that he delineated these various reasons that went up in his mind into the whole persona, which is the language he used to describe the juror's reasons for, or his reasons for accusing the juror, in each case he delineated those reasons and described why he was uncomfortable in light of those reasons. The woman was his view. To me, they looked like, oh, I'm going to have to make up something to get past this Batson problem. That's what they looked like to me. Seven out of eight black jurors get stuck? It's a little more than a coincidence, it seems to me. And if you compare the questions that were asked of white jurors, the church lady, various views on the death penalty, they weren't struck. It's hard to look at this record, especially including the other jurors that were struck, which are part of the motion to expand the CLA, and not get the distinct impression that this prosecutor thought he'd better off trying this black defendant with fewer blacks in the jury. Well, he said that was not the case, and the court seems to me... I did not get the impression that the court probed very deeply into his thought processes. I was particularly struck by the comment, oh, she comes from the wrong part of town. Now, again, I don't know. I haven't looked at the demographics of Paris, but counsel suggests that that's a community. And we've said Compton, saying somebody comes from Compton is a... Well, I've been to Compton, so I know what the demographics are there. And, you know, saying somebody comes from Compton, you know what that means. I find it a little troubling, on this list of not terribly persuasive reasons as to why this heavy, older church lady gets struck, none of which strike me as reasons in and of themselves to get rid of a juror. He says, oh, and she, you know, I've had a lot of trouble from people from that town. Well, the difference between this case, particularly on the issue of Paris, and the Bishop case, which is the closest analogy counsel attempts to draw, is that in the Bishop case, before the trial court, where the challenge was made, it was set out by the prosecutor himself describing the Compton area as a low-income minority community. So he himself put on the record and acknowledged he was looking at a factor that dealt pretty strongly with racial background. And the defense attorney also said, look, Compton is a community 75 percent black. And this Court's footnote looked at census figures, which verified that. And none of that is in this record. So you are at a position now where you're looking over the shoulder of the trial judge at no evidence as to the character of Paris, other than whether or not you're going to... What kind of reason is this to strike somebody because he comes or she comes from a particular community? I really sort of say, oh, this person comes from Pasadena. That strikes me as less than a rational reason. This sounds more like, gee, I'm going to have to think of something not to admit that I really just don't want to have blacks on this jury. And yeah, well, she comes from... She once lived in Paris. Coming up with a reason like that, what is it about Paris that would conceivably serve as a rational reason for striking a juror? We might not know if he simply said... But the absence of a rational reason, if you sort of come up and say, well, I decided not to do it because today is July the 12th or 15th, whatever the date is, and this is the day that I strike all people with the letter B. I mean, it came up with a reason like that. We say this is nuts. Obviously, this is not what you had in mind. You had some other reason, and because you couldn't think of a quick enough of a good reason, you came up with something really crazy like that. Well, it's certainly a factor to be considered in the Step 3 analysis. Well, I agree with that. Why don't you help me out here? But he did not simply say, well, she lived in Paris at a time. He said, she lived in Paris at a time, and I've had trouble with jurors from Paris, meaning, implying, in prior experience, people who come from Paris and sit on juries in my cases have voted against me. What does that mean? To say that somebody comes from a particular community and votes against you, I don't understand the relationship. It's sort of like that's my unlucky socks. I'm not wearing my lucky socks today. What is it about the community? There has to be something about the community that would make that rational, saying people come from there. Other than saying the demographics, which is the only thing that really makes sense. Now, that makes sense, but it's the thing that doesn't help you out. But we don't have any demographics, and we also have a prosecutor who is simply describing his experience, whether he can say, I've now identified what about people in Paris are my problem, or he cannot say that. All he can say is, I've had hard experiences with people from Paris. That's something that I look at and say, she's from Paris. I'm going to put it in the mix. Well, he said Watts. I'm sorry? I think he said Watts. What if he said Watts? Yeah, he said, you know, people from Watts just, I've had bad luck over there. Well, he said that. You would, at least in that situation, have a community in which we're fairly well knowing. The difference is that Watts means something. You know, we all know what Watts means. We all know what Harlem means. We don't know what Paris means, but it could very well mean the same thing. Well, but even if we know what Watts means in terms of racial community, that does not necessarily equate with the fact that he's using a race. Is there any doubt the prosecutor said, I'm striking her because she's from Watts, and people from Watts have voted against me, that that would be immediately just jump out as a bias or violation? Is there any doubt about that? I don't think. The prosecutor might even lose his job over that. I don't. I think that that's a racially neutral reason to say that people from Watts, in my experience on these cases, have voted against me and I've had trouble with it. There are, I assume, non-minorities in Watts. It's across the board, so to speak, in terms of my experience with these people from this area, whoever they might be racially, have voted against me in prior cases, and I don't know why, but that's something I have to look at and consider in exercising the peremptory. And that's what he said here. What about that other juror where he makes a phone call and he talks to this guy and finds out evidence that is not presented in the courtroom, and he finds out that this juror might go easy on black defendants but not so easy on whites. And so he strikes her for that reason. Since when do prosecutors, since when are people allowed to make phone calls like that and get evidence, racially significant evidence, I might point out, that they then bring into the courtroom? Is that a common practice in California? I can't answer that, and I don't know the answer to your question about a phone call. I want to expand the COA to at least include that other juror and find out what that phone call was about. I think the expansion of the COA has already been addressed by this court. There's a motion pending, isn't there? There's a request. The motion was already made and denied, but there's a request. Do you want to argue with me about it, or do you want to answer the question? I don't know the answer to that. That's a good answer. It's at least an honest answer. It's an honest answer. Very good. And that's what the trial court found here, that the courts Do you find troubling the idea that a prosecutor goes and makes a phone call and checks up on potential jurors? I Don't prosecutors get disciplined for that kind of thing? Or Do we really want lawyers looking into the, doing investigation of the private lives of jurors before they get put on? I don't know that that's done or not done in the usual course. I can't answer the question. It sort of jumped out of the page for me that this would happen. I would think that the prosecutor who did that wouldn't get appointed to the Superior Court. He'd get fired. Well, I know that prosecutors' offices deal with jurors from the community on a regular basis, and there is a pool of knowledge, at least years and years ago when I was a trial prosecutor, that is gathered on prior jurors and made available. No, there is clearly a pool of knowledge that I was aware of about whether jurors have served before and what jurors are. Prosecutors gather that information, and I think the defense bar, the public defender's office, gathers information. People who have served on jurors before, they get tracked, particularly the jury service changes a little bit, but you used to be in the pool for months or something, and you might get put with several juries, and they would certainly keep an eye on you, and if you should be on a hanging jury or maybe possibly an acquitting jury, you'd never sit on another jury again, right? Exactly. But that's quite different to, say, experience of things that happen in the courthouse that are available to everybody is going to be used, but making a phone call and then finding out information that says, gee, this lady might have more sympathy for black defendants and therefore saying that's a good reason to strike her. I'm troubled on two levels. I'm troubled on the level of where this information comes from, whether it's true, whether it's legitimate for him to do that, and I'm also troubled by the fact that he comes out in court and says, well, I don't want this one because she might go easy on a black defendant, and I certainly don't want that. Why isn't that a Batson violation right there? Well, it seems to me as we're discussing it, it is a race-neutral reason. It does not depend upon the race of the juror. It depends upon the juror's outlook. And if that's an honestly expressed view of the juror's outlook and how the juror is going to approach a particular case, that's a rational concern for a prosecutor in seeking a fair jury. Let me ask you to talk about the penalty phase. The points Mr. Darby brought up about the abuse evidence was the real blockbuster abuse evidence didn't come in. The district court disagreed, and I think the district court got it right. In addressing this, the court certainly recognized that there could potentially be some sympathetic value there, but that's not the end all of the analysis. As the court knows, under Williams you have to reassess the aggravating evidence against the mitigating that was presented and the new mitigating. Now, in this case, unlike the various other cases that we've talked about here, there was not minimal or no mitigating evidence presented. There was a substantial mitigating case presented here. As the district court noted, it was four days of testimony by friends, family members, and psychologists. There was a lot of testimony, but much of the testimony put on by the defense was actually harmful to the defendant. His mother and father got on the stand and said, you know, we did everything we could. We brought him up right. We hardly abused him. He was our favorite. We treated him right. And he just went wrong. He's a bad seed, you know. How did the testimony of the mom and pop help the defense, help paint the defendant in a sympathetic light? I think it was simply part of the overall picture that the defense counsel was That's not an answer. That's not an answer, overall picture. If the overall picture you paint is that the defendant is an unsympathetic, unreformable psychopath, saying it's part of the overall picture does not, is not an adequate answer. To me, looking at this, it looked to me like the kind of thing that you would not want to put on the stand. You would not want to put on the stand people who say, you know, this kid had a happy childhood. He was given every break in the world. We did everything once for him. He had a loving home. And he turned out bad because, you know, he's just bad. That's the last thing you would want to do if you are trying to get sympathy for the jury. But that's not my impression of that testimony, even though it didn't Well, that's my impression of the testimony. Why don't you persuade me otherwise? My impression is that he presented the parents who raised him. But I don't think there is anything What was the point of it? He has this time. This is his chance. The jury just found that he deliberately killed this person. What, how does it help persuade the jury that they ought not to take his life by putting the, starting off with the two parents on the stand? The two parents who say, you know, how he had every break as a kid. I don't think they said they had every break as a kid. I think they Pretty much. Described his situation Pretty much. But how does, you said he had four days of testimony. How did that testimony help? How did the parents testimony help? Yeah. Because, I apologize, it painted the picture of who Richard Boyd was and how he was brought up. You know, you said this once before, but that does not answer the question. Painting the picture is not his job. His job is to create sympathy. So the fact that they painted a picture which made the defendant look bad, even if somehow true, doesn't help the mitigation case. How did it help? And I'm going to ask you this last time. If you don't want to answer, we'll move on to something else. How did it advance his mitigation case to put the two parents on the stand? Well, if for nothing more than to show and put a face on what would be the personal impact of imposing a sentence of death on this man because it is his mother and his stepfather sitting before the jury in an effort to have that not occur. And in this weighing decision that you're going to undertake, you cannot simply add in this situation the new evidence. You have to subtract. So the idea is don't hurt these poor old people by killing their son. That was the mitigation? I think you give the jury a face on his mother who obviously does not want her son put to death. And that's what you're going to lose. It's pretty lame. Okay. I understand the answer. That's what you're going to lose in the defense view. You're going to lose, and that's what he says, the mother and the stepfather. And you're not going to lose that. Was there any reason for him not to follow up on evidence from the – that the investigator brings to him, the sister that he was beaten? He was often severely beaten with an extension cord, that blood was drawn, that he would – parents would beat him with a limb, all the children, with the bricks, with whatever. I don't think that we had any evidence of a tactical reason for not doing so, other than his not seeing it as all that significant in the overall picture that he was attempting to display. But the Court didn't make any assessment of deficit performance and simply assumed it and decided this issue on the basis of prejudice. And that's where I'm suggesting that that is support for that decision on the record. But what about how time was saying there's no prejudice? If he had been painted as an abused child, a victim, somebody who had been tortured by his parents, who had had to witness the sexual abuse of his sisters by the stepfather, somebody who had a – no warm relationship with his parents, had been cut off from any – from the normal warm relationship the children have with loving parents. And if he had put on a better set of psychiatrists or psychologists or whatever he put on, which, you know, their testimony was just disastrous. I mean, they might as well just tell the jury, you go ahead and fry this kid because there's no hope for him. If you ever let him out, don't ever, you know, make sure that you keep your children out of his way because nobody's safe. I think that – Pretty, pretty, pretty poor performance. I mean, you might see something like this in Texas or something, but I've never seen anything like this in California. Well, I don't think that's the case in 1982 in California, but I'm not going to argue with you. I've seen a fair number of death cases. I've never seen anything like this. Okay. I think, though, that if you paint this picture, you're going to end up with, number one, minimal. You have to look at the evidence that was presented. And the mother and the stepfather simply do not go away. If they're not presented by Mr. McMillan and he's going to demonize them, they're certainly available to the prosecutor. Their testimony is in record, which disputes this sympathetic picture of abuse. And the evidence before the jury, if, in fact, this entire picture is presented to the jury – So you're saying the prosecutor will have brought mom and dad in to testify, go ahead and fry my son because, you know, we didn't do these things? No, and I don't think they – I think there would be a daring prosecutor, indeed, who in the penalty phase of a case would put the defendant's mother and father on the stand. Because that would be sympathetic evidence? Normally that would be the case. But in this situation, mother and stepfather were on the stand and disputed, if you will, refuted these claims. There was no refutation to be had. The jury was not aware of the picture that was painted of the home life of the children that was given to the defense investigator by the sister and who then later testified and all testified that this was true. That's correct. But the parents testified and the substance of their testimony is that this – that was not the case. Whether the jury is going to fall on one side or the other, what you have before the jury in the situation where you add this new mitigating evidence is you have a family dispute. Let me ask – excuse me. You would at least have had a fight over it.  You would at least have had a fight over it instead of having the kid pointed as the one bad guy in the courtroom. You would have had a family fight in front of the jury. I'm worried about the testimony of Dr. Waters at the penalty phase where Dr. Waters is asked if Floyd is able to escape or get out of the institution, would you continue to pose that kind of threat? And the doctor answers yes. That strikes me as pretty serious stuff. Because of the failure to object on the state law ground? Yeah, and because you're not supposed to speculate about future dangerousness. Well, certainly objecting to it would have been an appropriate tactical decision, but if you follow Dr. Waters' testimony when Mr. McMillan got back on the offensive to question her, one of the things he asked her about was her ability to project future dangerousness, and she told the jury psychologists simply aren't any good at it. So there are different ways of dealing with harmful testimony. One is to object to it if there's a basis. The other, when it's there, is to deal with it and undermine it on redirect, which is what he did. I mean, the whole thing shouldn't have even been in front of the jury to begin with. I understand that. But in the ebb and flow of the trial process, you cannot obviously control each question and answer and the pace and the tone. And I don't know what the pace and the tone was here or whether it got past him too quickly for him to object. He could have objected after it happened, highlighted it to the jury, had it stricken. Well, the question shouldn't have been asked. Right. But we're dealing with not a question of prosecutorial misconduct, but a question of ineffective assistance of counsel. And the question is. They're flip sides of each other in this case. When he's saying it got by the defense lawyer, the reason it got by the defense lawyer is because the prosecutor asked the question that he should have known was improper, that he's not supposed to ask. Well, the response normally is an objection if that's the case. And the problem here is the claim here is he should have objected. And what I'm saying is there are various ways of dealing with improper evidence, either objecting before or after. Before, if you have time. After, if you want it highlighted. The best way to deal with it is to have the prosecutor not do things that are improper by asking the question. That's the first line of defense. Certainly. And if defense counsel is prescient about these things, he would ask for a pretrial ruling or a prewitness ruling on various issues. But in my experience, that doesn't happen on these various little small evidentiary matters. I don't mean small in terms of unimportant, but point by point by point. I, for one, think the evidence of extra abuse may or may not. I'm not convinced the evidence of extra, the extra evidence of abuse would necessarily change the jury's verdict. But here you have his mental health expert saying this guy poses a danger if he ever manages to get out of prison. Well, if you're talking about Dr. Waters, she said we're not any good at projecting that. We're not any good at deciding that. That's what Mr. McMillan brought out in his redirection. But this is his expert. This is the expert that his lawyer puts on the stand to help in a mitigation case. And what comes out of her mouth is a highly unsympathetic picture. And, in fact, you know, I'm the one who's been hired to provide evidence helpful to the defense. And I'm telling you, don't, this guy's not capable of rehabilitation. He's a danger. If he ever escapes, he's a menace. This is from his expert. What kind of lawyer hires an expert like that and puts that kind of person on the stand? It's better not for the prosecutor to put someone like that on the stand and the question is sort of by. But having come out of his expert's mouth? Well, you're positing is he had an opportunity to try and do something in penalty here where, when the jury finishes guilt phase, what they know of Richard Boyd is solely based. He had a review from another lawyer, was it Mr. Olson? I think that's right. Who told him, don't do this. You know, these are bad experts. You've got to get somebody who's experienced and you've got to get somebody, you know, I've looked at her testimony. I looked at her statements. And this is somebody who's going to hurt you. And what does he do? He puts her on the stand. He puts her on the stand. The first question, the first answer out of her mouth starts damning the kid. Says nothing helpful. And then when the prosecution gets to her, she manages to nail the coffin shut. I mean, she might as well have told the jury, you know, you better give her that penalty. But the defense point of view in this entire presentation was to give the jury an understanding of where Richard Boyd came from and why he did what he did. Essentially, they were presenting him as somebody who was the product of a difficult upbringing, a difficult lower intelligence, problems in school, out on the street, a person who was on a pathway to self-destruction as he described it, somebody who he could now tell the jury this is not. He could lead up to the great closing argument where he said, you know, this guy is trying to commit suicide by jury, and don't you do him the favor, even though he wants to be executed to attract attention to himself. But he didn't say he wanted to be executed. He said his life is a pathway of self-destruction from bad choices, bad opportunities. He pretty much said that. No, I don't. I disagree with you on that. He said, don't execute him. He said, I'm here to ask you not to execute him. He's saying don't do it even though he wants it, even though he's looking for attention. He commits this crime and he's looking as he wants execution. But nobody said it, but, you know, obviously he does. And don't you, don't you, don't you do it for him? No, I don't think he said he wants. He said his life is self-destructive, and he's asking the jury not to impose a death penalty, which is the ultimate self-destruction in this case from the life path that he was stuck in. And stuck from very early age, which is why he's using Waters to give them a picture of this young man. Back at the time when he entered CYA, he was stuck in this life path of low intelligence, poor background, bad choices, no opportunities. Your position is not incompetent for a lawyer to put on the stand a psychologist who then expresses a view that this guy, the impermissible view that this guy, if he gets out, is going to be a danger to the community. I think that. That's the kind of thing that a lawyer worth his salt wouldn't go over with a witness and figure out that if she has those views, this is a dynamite stick that you don't stick on the stand where she might explode with that if the prosecution gets its hands on her. I find that really hard to believe that that amounts to competency. You might argue prejudice. I don't know. But I had a hard time. But using California standards again, not those of another State, that is a competent lawyer. Well, and that's my focus is trying to argue to deal with the prejudice aspect of it. But I think it overlaps because the goal of McMillan here was to give the jury a reason for and an understanding of why Boyd ended up what he ended up and did what he did. He told the jury there's more to just a man than what he ends up doing. You've got to look at him, his background, understand why he comes to be doing that. So whether or not, whether or not he is somebody who will not reform and will be a danger, a conclusion I submit that the jury would have reached whether Dr. Waters testified to it or not. But whether or not he is, the answer from Mr. McMillan's point of view is, number one, you can't simply try and develop something about a person's personality and background and pick out the bad stuff because it comes back even worse on cross-examination. But number two, he wanted to give the jury an understanding of where Richard Boyd was and why he did what he did. And simply he was trying to get them to understand that he is not as guilty as somebody who had a, the opportunity of good intelligence, jobs available to him, no prior impact of the CYA or the prison system. All of these factors that went into making him what he was reduced his culpability and that was his point. Thank you. Your time is up. Thank you. Mr. McMillan may have wanted to give the picture of Mr. Boyd as he was, but he made no effort. He basically ceded that obligation to experts, which he knew had an opinion that was going to prejudice the jury against the client, and he made no effort, and he admitted he made no effort to prepare those experts. And I won't repeat anything that was said about Ms. Waters, because she was also bad. But Dr. Oppenstein, who ultimately characterized Richard Boyd as a psychopathic and who in the closing argument, the prosecutor said to the jury that I didn't cross-examine this witness because I agreed with everything he said. This is a witness that in preparing or in at least interviewing Dr. Oppenstein, we have McMillan's notes of that interview, which are record references 118 to 120, and it includes the knowledge that exposure to people like Charles Manson reinforces bad things, vindictive personality. In a sense, he's like a time bomb. He should be locked up in prison for life. And without any effort to shape that testimony, Mr. McMillan put those witnesses on the stand. Judge Keller says, you know, even if things were not handled the way they should, even if more mitigation that you proposed should have come in but didn't, when you compare the viciousness of the crime and his long, violent criminal history and the fact that it came before the jury that he was planning an armed escape from jail while the trial was pending and all these other things, the result would have been the same. And this extra mitigation wouldn't have changed, outweighed the aggravation in any reasonable juror's mind. What's the answer to that? Well, the first answer to that is that Judge Keller did not consider at all and dismiss the claim that the very discussion you were having with counsel for the Respondent about the psychological experts. Judge Keller found that McMillan did a thorough and professional job in preparing those experts for their testimony. And I just think that is just clearly erroneous and not supported by the record at all. Because if you take that view, then you're only looking, although I won't concede that if you just look at the abuse and the evidence that could have been presented and you look at the cases like Douglas and you look at Stankiewicz, you know, which had much worse aggravating evidence, even if you reweigh those, even Judge Keller said, the evidence of abuse, not considering its impact on the way that the experts testified and not considering how badly they testified, it might have inspired sympathy. That's enough under Douglas for reversal. The problem is, Darby, and I don't want to waste your time, you get to your point, but you've got two different cases. You've got a case where the abuse and the aggravation have some arguable relationship. In this case, you have to tell me where the abuse and the aggravation would have an arguable relationship. Now, I gather that you've left it by saying, if you've been abused, then that excuses anything you might do in aggravation because you've had a hard time. But in the one case where we saw a problem, it was because of the biting, the stabbing, that had a relationship to the fact that the stabber had been abused. This case, what he was doing was making absolutely certain that he wouldn't be detected. Well, with all respect, I think that the basis for the abuse evidence is not a relationship, and I'm not sure the case has established it. It's to get sympathy. I'm not suggesting it's required. I'm not suggesting it's required. I'm thinking about the juror who has to use it, and I'm wondering how he's going to argue. The purpose is to get sympathy. And Judge Keller admitted it might have inspired sympathy. That's enough. That's enough under this Court's Douglas decision. That's what was being sought, and that's what didn't happen. Thank you. I see your point. I think we had some seconds left. No, you didn't. I guess the red light zone. The red light zone. Did you make your last point? I didn't want to take you away from your last point. My last point is just that in terms of the reweighing of the evidence, and it may relate to your aggravation point, Judge Keller said this case is more like a case called The defendant was a victim of the system, his parents and himself, was not ineffective given the State's overwhelming evidence in aggravation together with the limited mitigating evidence available to the defense. Judge Keller thought the evidence was limited in mitigation. It shouldn't have been limited. It should have been much more substantial. Thank you. Thank you, counsel. The case is argued. It stands submitted. We are adjourned. All rise. The defense is adjourned.
judges: Farris, Kozinski, Silverman